1  **LTL ATTORNEYS LLP**
2  David W. Ammons (Bar No. 187168)
    david.ammons@ltlattorneys.com
3  David A. Crane (Bar No. 305999)
    david.crane@ltlattorneys.com
4  300 South Grand Ave., 14th Floor
5  Los Angeles, CA 90071
6  Phone: (213) 612-8900
    Fax: (213) 612-3773
7
8  Peter Safirstein (*Pro Hac Vice* Pending)
    **SAFIRSTEIN METCALF LLP**
9  350 Fifth Ave., 59th Floor
    New York, NY 10118
10 Telephone: (212) 201-2855
    Facsimile: (212) 201-2858
11
   Hung G. Ta (*Pro Hac Vice* Pending)
12 **HUNG G. TA, ESQ. PLLC**
13 250 Park Avenue, 7th Floor
    New York, NY 10177
14 Telephone: (646) 453-7288
15
   Attorneys for Plaintiff
16 Jeffery Kocen
17
   *[Additional counsel appear on signature page]*
18

PAID

MAR - 2019

Clerk, US District Court
COURT 4612

19            **UNITED STATES DISTRICT COURT**
20            **CENTRAL DISTRICT OF CALIFORNIA**
21 JEFFERY KOCEN, Derivatively and on        Case No. **CV19-01741-**
   Behalf of OSI SYSTEMS, INC.,
22
                                              **[FILED UNDER SEAL]**
23              Plaintiff,
                                              **VERIFIED STOCKHOLDER**
24      v.                                    **DERIVATIVE COMPLAINT**
                                              **FILED UNDER SEAL**
25 DEEPAK CHOPRA, AJAY MEHRA,                 **PURSUANT TO L.R. 79-5.2.1 (ii)**
26 WILLIAM F. BALLHAUS, GERALD
27 CHIZEVER, STEVEN C. GOOD,                  **JURY TRIAL DEMANDED**
   JAMES B. HAWKINS, MEYER
28

─────────────────────────────────────────────
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**LTL ATTORNEYS LLP**
David W. Ammons (Bar No. 187168)
 david.ammons@ltlattorneys.com
David A. Crane (Bar No. 305999)
 david.crane@ltlattorneys.com
300 South Grand Ave., 14th Floor
Los Angeles, CA 90071
Phone: (213) 612-8900
Fax: (213) 612-3773

Peter Safirstein (*Pro Hac Vice* Pending)
**SAFIRSTEIN METCALF LLP**
350 Fifth Ave., 59th Floor
New York, NY 10118
Telephone: (212) 201-2855
Facsimile: (212) 201-2858

Hung G. Ta (*Pro Hac Vice* Pending)
**HUNG G. TA, ESQ. PLLC**
250 Park Avenue, 7th Floor
New York, NY 10177
Telephone: (646) 453-7288

Attorneys for Plaintiff
Jeffery Kocen

*[Additional counsel appear on signature page]*

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFERY KOCEN, Derivatively and on Behalf of OSI SYSTEMS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>DEEPAK CHOPRA, AJAY MEHRA, WILLIAM F. BALLHAUS, GERALD CHIZEVER, STEVEN C. GOOD, JAMES B. HAWKINS, MEYER | Case No. CV19-01741-CJC-FFMx<br><br>**[FILED UNDER SEAL]**<br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FILED UNDER SEAL PURSUANT TO L.R. 79-5.2.1 (ii)**<br><br>**JURY TRIAL DEMANDED** |

PAID

MAR − 2019

Clerk, US District Court
COURT 4612

---

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   LUSKIN, and DAVID T. FEINBERG,

2                    Defendants,

3        and

4   OSI SYSTEMS, INC.

5   Nominal Defendant.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1.     Plaintiff, Jeffery Kocen ("Kocen" or "Plaintiff"), by and through his undersigned attorneys, brings this Verified Shareholder Derivative Complaint ("Complaint") in the name of and on behalf of nominal Defendant OSI Systems, Inc. ("OSI" or the "Company") against certain directors and officers of OSI named herein. Plaintiff brings his claim based on personal knowledge as to his own acts, and on information and belief as to all other allegations, based on an investigation by counsel, including: (a) review and analysis of public filings made by OSI and other persons with the Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications caused to be disseminated by certain of the Defendants and other persons; (c) review of news articles, shareholder communications, and postings on OSI's websites concerning the Company's public statements; (d) statements made in a securities fraud filing, captioned *Arkansas Teacher Retirement System and John A. Prokop v. OSI Systems, Inc., et al*, No. 17 CV 17-08841-VAP (SKx) (C.D. Cal.) ("Securities Complaint"); (e) review of confidential OSI records obtained by means of a request for inspection of books and records under 8 *Del. C.* § 220; and (f) review of other publicly available information concerning OSI and other persons.

## SUMMARY OF THE ACTION

2.     This is a shareholder derivative action brought by an OSI shareholder on behalf of the Company against certain of its officers and directors seeking remedy for the breaches by OSI's board of directors ("Board") and senior officers in abdicating their fiduciary duty of oversight with respect to the Company's turnkey contract with the Government of Albania (the "Albanian Contract").

3.     OSI has three operating divisions: (a) Security, which provides security and inspection systems, turnkey security screening solutions and related services under

1 | the "Rapiscan Systems" trade name[1]; (b) Healthcare; and (c) Optoelectronics and
2 | Manufacturing.

3 |       4.    On August 21, 2013, OSI announced in a press release that its Security
4 | division, Rapiscan Systems, was awarded a fifteen-year contract by the Government of
5 | Albania to "provide turnkey cargo and vehicle security screening services at various
6 | sites throughout the Country" (the "Albanian Contract").  OSI touted the Albanian
7 | Contract as a "significant award." The Company further announced that it anticipated
8 | gross revenues ranging from $150 million to $250 million over the term of the
9 | agreement.

10 |       5.    OSI, however, apparently relied on bribes of Albanian government
11 | officials to win the Albanian Contract.

12 |       6.    On December 6, 2017, Muddy Waters Research ("Muddy Waters"), a
13 | widely-followed short-seller, published a scathing examination of OSI's business
14 | dealings with the Government of Albania (report available at:
15 | http://www.muddywatersresearch.com/research/).  In that publication, Muddy Waters
16 | published their conclusion that the Company "was rotten to the core."  In support of
17 | this contention, they cited evidence that the Company had "obtained a major turnkey
18 | contract in Albania through corruption" and that there had been an "unannounced
19 | transfer of 49% of [OSI's] project company, S2 Albania SHPK, to a holding company
20 | owned by an Albanian doctor, for consideration of less than $5.00."

21 |       7.    The Muddy Waters report further indicated that the Company's financial
22 | statements were materially misstated as a result of, among other things, the failure to
23 | properly record income from the Albanian Contract.

24 |       8.    OSI responded to the Muddy Waters report in a press release on the same
25 | date, December 6, 2017, but did not deny any of the allegations of corruption involving
26 | the Albanian Contract.

27 |

28 | [1]     The Security Division also utilized the trade name "AS&E."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

9.      On January 31, 2018, Muddy Waters responded to the Company's press release with an additional report.   In that report, Muddy Waters stated that its conclusion was unchanged and that it still believed OSI was "rotten to the core." Moreover, as to the Albanian Contract, Muddy Waters, in addition to a number of other points, questioned the viability of the contract in the absence of corruption (report available at: http://www.muddywatersresearch.com/research/).

10.     On the following day, February 1, 2018, OSI announced in a Form 8-K filing that the SEC had commenced an investigation into the Company's compliance with the Foreign Corrupt Practices Act ("FCPA"). The United States Attorney's Office for the Central District of California also stated that it intended to request information related to the Company's compliance with the FCPA.  Both federal investigations were said to have been in response to the Muddy Waters reports.

11.     In the February 1, 2018 Form 8-K filing, the Company also announced that both the SEC and the Department of Justice were investigating trading in the Company's securities and that, "[i]n relation to the matters that are the subject of the trading-related investigation, the Company has taken action with respect to a senior-level employee."

12.     The investing public reacted swiftly and severely to the news surrounding the Company.  The Company's stock (traded on the New York Stock Exchange) closed at $84.07 on December 5, 2017.  The next day, following the publication of the first Muddy Waters report, the stock closed at $59.52 on very heavy volume.  Although the stock price recovered some of its losses in the interim, the stock price dropped approximately $12.00/share on the news of the government investigations on February 1, 2018.  As of January 8, 2019, the stock closed at $71.39 – still significantly below where the stock traded at prior to the Muddy Waters disclosures.

13.     The Company is currently facing federal securities lawsuits in this district.

14.     Stunningly, following the widespread news of the corrupt Albanian Contract, the Board acted to significantly increase the compensation of OSI's CEO,

founder and Chairman, Deepak Chopra. As reported in the Company's Form 10-Q for the first quarter of 2018: "On December 31, 2017, we and Deepak Chopra, our Chief Executive Officer, entered into an amendment to Mr. Chopra's employment agreement that, among other things, provides for a $13.5 million bonus payment to Mr. Chopra on or within 45 days of January 1, 2024 contingent upon Mr. Chopra's continued employment with us through that date, subject to accelerated payout terms in the event of Mr. Chopra's death or disability after January 1, 2019. The bonus is recorded in the financial statements over the remaining term of the employment agreement."

15.    This award to Chopra, timed soon after the publication of the Muddy Waters report, is particularly troublesome given the Company's history of poor corporate governance. A significant portion of the Company's revenues over the years have resulted from contracts with the U.S. government. Yet the Company has been accused over the years of defrauding the U.S. government in connection with these contracts. The Company was threatened with "debarment" by the U.S. government and the U.S. government terminated a $67.1 million contract after concluding that for the period between 2010 and 2013, OSI's wholly-owned subsidiary, Rapiscan Systems, Inc., "provided false or misleading information to the Government."

16.    The Company's troubles with the government also resulted in OSI entering into a 30-month Administrative Agreement with the government in June 2013 pursuant to which, among other things, the Company undertook specific corporate governance changes. The Company was also the subject of a federal securities class action that settled for $15 million in 2015 as well as a derivative lawsuit, prosecuted by this plaintiff (among others) in this federal district which also resulted in a settlement that was finally approved on May 2, 2017 (*In Re: OSI Systems, Inc. Derivative Litigation*, 14-cv-02910-MWF) ("Derivative Settlement"). The Derivative Settlement mandated that OSI undertake remedial corporate governance changes.

17.    On January 11, 2018, Plaintiff Kocen sent a books and records demand to the Company pursuant to 8 *Del. C.* § 220 ("Demand"), seeking to obtain documents

4

related to the Albanian Contract.  Plaintiff's investigation included numerous follow up requests to the Company.

18.     OSI produced more than 1,200 pages of documents responsive to the Demand on March 16, 2018, April 6, 2018, June 7, 2018, July 28, 2018, August 17, 2018 and August 31, 2018.

19.     The documents produced pursuant to the Demand demonstrate a complete lack of supervision by OSI's Board and a breach of the Board's fiduciary duties.

## JURISDICTION AND VENUE

20.     This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332.  Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

21.     This Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or an individual who is either present in this District for jurisdictional purposes, or has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because: (i) one or more of the Defendants either resides or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; and (iii) Defendants have received substantial compensation and other transfers of money in this District by doing business and engaging in activities having an effect in this District.

## PARTIES AND OTHER PERSONS

**A.     Plaintiff**

23.     Plaintiff Jeffery Kocen has owned OSI common stock continuously since January 2001.  Plaintiff is a citizen of Kansas.

**B.     Nominal Defendant**

5

24.     Nominal Defendant OSI Systems, Inc. is a Delaware corporation with its principal executive offices located in Hawthorne, California.

**C.     Executive and Director Defendants**

25.     Defendant Deepak Chopra ("Chopra") is a founder of OSI, and has been an OSI director since 1987, and Chairman of OSI's Board since 1992. Chopra also serves as President and Chief Executive Officer ("CEO") of OSI, as well as of many of OSI's subsidiaries.  Defendant Chopra is a citizen of California.

26.     Defendant Ajay Mehra ("Mehra") has been a member of OSI's Board since March 1996.  Mehra is OSI's Executive Vice President, and President of OSI Solutions Business.  Mehra and Chopra are cousins.  Defendant Mehra is a citizen of California.

27.     Defendant William F. Ballhaus ("Ballhaus") has served as a director of the Board since May 2010.  Ballhaus is a member of the following OSI Board Committees: Audit, Nominating and Governance, Compensation and Benefits, Technology (Chair) and Risk Management.  Ballhaus is a citizen of California.

28.     Defendant Gerald Chizever ("Chizever") has served as a director of the Board since October 2016.  Chizever is a member of the following OSI Board Committees: Technology and Risk Management.  Chizever is a citizen of California.

29.     Defendant Steven C. Good ("Good") has served as a director of the Board since September 1987, shortly after the Company was founded.  Defendant Good was an initial investor in the Company.  Defendant Good is Chairman of OSI's Audit Committee, and a member of OSI's Compensation and Benefits and Risk Management Committees.  Defendant Good is a citizen of California.

30.     Defendant James B. Hawkins ("Hawkins") has served as a director of the Board since December 2015.  Hawkins is a member of the following OSI Board Committees: Audit, Nominating and Governance (Chair) and Technology.  Defendant Hawkins is a citizen of California.

31.     Defendant Meyer Luskin ("Luskin") has served as a director of the Board

1  since February 1990.  Luskin is a member of the following OSI Board Committees:
2  Audit, Compensation and Benefits (Chair) and Risk Management.  Luskin is a citizen
3  of California.

4      32.   Defendant Dr. David T. Feinberg ("Feinberg") is a former OSI director
5  and served from March 2010 until 2016.  Feinberg was Chairman of OSI's Nominating
6  and Governance Committee and a member of the Technology Committee.  Feinberg is
7  a citizen of California.

8      33.   Defendants Chopra, Mehra, Ballhaus, Chizever, Good, Hawkins, Luskin
9  and Feinberg are collectively referred to as the "Director Defendants."

10                    **SUBSTANTIVE ALLEGATIONS**

11  **I.   THE ALBANIAN CONTRACT**

12      34.   On August 21, 2013, OSI announced in a press release "that the
13  Government of Albania has awarded its Security Division, Rapiscan Systems, a
14  fifteen-year contract to provide turnkey cargo and vehicle security screening services
15  at various sites throughout the country."  In the same press release, the Company further
16  stated: "Rapiscan Systems intends to provide a comprehensive X-ray screening
17  program, which will incorporate technology, staffing, systems integration, and
18  maintenance support at sites throughout Albania.  These operational capabilities are
19  intended to enhance the Albanian government's capability to interdict contraband and
20  undeclared materials. The Company currently anticipates that total gross revenues may
21  range from $150 million - $250 million over the term of the agreement. Actual
22  revenues could differ significantly from the range provided as the generation of
23  revenue is based upon the volume of cargo and other factors."

24      35.   The Albanian Contract had been officially entered into on April 10, 2013
25  with Albania's Ministry of Finance.  News reports indicate that the contract was signed
26  by Jonathan Fleming, then-President of S2 Global, the OSI subsidiary that was
27  established to contract with the Government of Albania, and by then-Minister of
28  Finance, Ridvan Bode ("Bode"), a member of the Albanian Democratic Party.

attempted to terminate it.[2]

43.   In 2014, OSI sought to enforce the Albanian Contract and filed for arbitration in Vienna seeking compensation in the amount of $359 million.

44.   On April 28, 2015, OSI and the Government of Albania reached a settlement of the arbitration regarding the Albanian Contract (to be effective on October 31, 2015) on terms less favorable to OSI and more favorable to the Government of Albanian.   More specifically, the value of the renegotiated Albanian Contract now contemplated a decrease of more than 100 million Euros in projected revenue to OSI compared with the previously negotiated contract.

45.   The Company, however, was silent as to the turmoil surrounding the implementation of its previously highly-touted Albanian Contract.   As a result, investors were led to believe that the Albanian Contract, announced with great fanfare in a press release in August 2013,[3] was steadily progressing.

46.   OSI did not disclose to investors the material information alleged herein regarding its procurement of the Albanian Contract or the material change in terms resulting from the arbitration.   For example, in June 2014, the Company stated that, "in Albania,[ ] the construction is ongoing, which is our latest deal, as well as the equipment."   In late August 2014, Defendants disclosed that the Government of Albania was "halting further progress" of the turnkey contract, but continued to knowingly conceal the true facts and corrupt history of the turnkey contract, including the 49% transfer and profit-sharing agreement with ICMS.

---

[2]     *See* "New 'Tax' on Customs," *Monitor* (an Albanian language publication), July 13, 2015.

[3]     "This significant award from Albania to provide turnkey screening services builds upon similar long-term agreements awarded by the Puerto Rico ports authority and Mexico's tax and customs authority. Our strategy of expanding our security offerings beyond the manufacture and sale of screening and detection equipment by providing comprehensive turnkey screening services continues to be well received in the marketplace."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**II.    THE TRUTH EMERGES REGARDING THE ALBANIAN CONTRACT**

47.    On December 6, 2017, Muddy Waters, the noted shortseller, reported that OSI was "rotten to the core."

48.    In its report, Muddy Waters cited its independent research finding that "[w]e believe [OSI] obtained a major turnkey contract in Albania through corruption."

49.    Moreover, the report concluded, "[i]t appears to us that [OSI's] accounts do not reflect the transfer [of 49% of OSI's project company]– there are no deductions for non-controlling interests in the income statement, and February 2017 bond offering documents appear to show the subsidiary as 100% owned by [OSI]."

50.    According to the Muddy Waters report, the corrupt behavior surrounding the awarding of the Albanian Contract put OSI's U.S. government contracting business at significant risk and also put the Company and certain individuals at risk of prosecution under the FCPA.  Muddy Waters estimated that the cost to the Company could be in the hundreds of millions of dollars.

51.    The Muddy Waters report contained translations from previously undisclosed Albanian reports referring to the Albanian Contract as the "theft of the century."

52.    On December 6, 2017, OSI issued a press release responding to the Muddy Waters report.  OSI stated that its Albanian Contract was the result of a "public tender."  The Company also stated that its Albanian turnkey security program was run in partnership with a local company, ICMS, and that significant capital contributions had been made.  At no time did OSI deny any of the allegations of corruption.

53.    On January 31, 2018, Muddy Waters responded to OSI's December 6, 2017 press release with another published report.  In that report, Muddy Waters reiterated its conclusions of corruption in connection with the Albanian Contract.

54.    The next day, on February 1, 2018, OSI announced that both the SEC and the U.S. Department of Justice were investigating OSI in connection with the

1  allegations set forth by Muddy Waters.

2  **III.   FIDUCIARY DUTIES OF THE DEFENDANTS**

3        **A.   Defendants' Duty Under *Caremark***

4        55.   By reason of their positions as officers, directors, and fiduciaries of OSI

5  and because of their ability to control the business and corporate affairs of OSI,

6  Defendants at all relevant times owed fiduciary duties to OSI and its stockholders,

7  including the duties of care, loyalty and good faith.

8        56.   Under *In re Caremark Int'l Inc. Derivative Litigation*, 698 A.2d 959 (Del.

9  Ch. 1996) and its progeny, a board of directors of a Delaware corporation, as well as

10  its officers, have the specific fiduciary duty to: (a) implement an information reporting

11  system and controls; and (b) oversee and monitor the operations of that information

12  and reporting system.  Under the second prong of *Caremark*, directors and officers

13  breach their fiduciary duty of loyalty if, having implemented a reporting and

14  information system and controls, they consciously fail to monitor or oversee its

15  operations, thus disabling themselves from being informed of risks or problems

16  requiring their attention.[4]

17        57.   The *Caremark* duty is especially heightened with respect to the

18  monitoring of fraudulent and criminal conduct, as opposed to other, more general

19  business risks.  As the Delaware Court of Chancery has stated, "Directors should,

20  indeed must under Delaware law, ensure that reasonable information and reporting

21  systems exist that would put them on notice of fraudulent or criminal conduct within

22  the company.  Such oversight programs allow directors to intervene and prevent frauds

23  or other wrongdoing that could expose the company to risk of loss as a result of such

24  conduct."[5]  More recently, the court stated that "imposing *Caremark-type* duties on

25

26

---

27  [4]    *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

28  [5]    *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 131 (Del. Ch. 2009).

11

1  directors to monitor business risk is fundamentally different from imposing on directors
2  a duty to monitor fraud and illegal activity."[6]

3      58.    Here, one of the most significant risks OSI faced was non-compliance
4  with legal and regulatory requirements regarding the procurement of government
5  contracts in violation of the FCPA.  Defendants were well aware that OSI was at a
6  heightened risk for running afoul of these requirements because the Company had
7  previously been accused of committing fraud in connection with its government
8  contracts.

9      59.    As set forth in greater detail herein, Defendants breached their fiduciary
10  duty by failing to oversee and monitor the Company's information and reporting
11  systems, under the second prong of *Caremark*.  As alleged herein, Defendants owed
12  very specific responsibilities to monitor their information and reporting systems for
13  fraudulent and criminal conduct, and to ensure that the Company complied with all
14  legal and regulatory requirements.  Moreover, these responsibilities indisputably were
15  known by Defendants.  In conscious disregard of these responsibilities, Defendants
16  failed to monitor or oversee the operations of OSI's information and reporting system,
17  thereby disabling themselves from being informed of the non-compliance and
18  fraudulent/unlawful practices.  By failing to act in the face of a known duty to act, and
19  by demonstrating a conscious disregard for their responsibilities, Defendants failed to
20  act in good faith and breached their fiduciary duty of loyalty.

21      **B.**    **Specific, Additional Duties Of The Audit Committee**

22      60.    At all relevant times, Defendants Good, Luskin, Hawkins and Ballhaus
23  ("Audit Committee Defendants") sat on OSI's Audit Committee.

24      61.    According to the Audit Committee Charter, "the Committee will assist the
25  Board in fulfilling its oversight responsibilities with respect to: (i) the annual and

26

---

27  [6]    *In re Goldman Sachs Group, Inc. S'holder Litig.*, No. 5215-VCG, 2011 Del. Ch.
28  LEXIS 151, at *72 (Del. Ch. Oct. 12, 2011) (internal quotation omitted), *cited in Reiter v. Fairbank*, No. 11693-CB, 2016 Del. Ch. LEXIS 158, at *23 (Del. Ch. Oct. 18, 2016).

quarterly financial information to be provided to stockholders and the SEC; (ii) the system of internal controls that management has established; and (iii) the internal and external audit process."

**C.    Specific, Additional Duties Of The Risk Management Committee**

62.    At various pertinent times hereto, Defendants Ballhaus, Chizever, Good and Luskin sat on OSI's Risk Management Committee.

63.    According to this Committee's Charter, "[t]he purpose of the Risk Management Committee … will be to assist the Board in its oversight of the Company's management of key risks, including strategic, operational, legal, regulatory, compliance, security, reputational and other risks, as well as the guidelines, policies and processes for monitoring and mitigating such risks."

64.    Moreover, the Risk Management Committee's Charter also states: "[r]isk assessment and risk management are the responsibility of the Company's management. The Committee has an oversight role and, in fulfilling that role, it relies on the reviews and reports provided by Company management. The Committee shall have the authority, as it deems appropriate, to conduct investigations into any matters within its scope of responsibility and retain as needed any independent counsel, consultants and other outside experts or advisors as the Committee believes to be necessary or appropriate to perform its duties and responsibilities."

65.    Specifically, the Risk Management Committee's Charter also charges the Committee with responsibility to:

- Monitor all enterprise risks, with the understanding that certain specific responsibilities for risk oversight have been delegated to other Board committees.
- Coordinate with the other standing committees of the Board to assist such committees in their review of the Company's risks, the oversight of which has been delegated to them.

of the Company's risk and make recommendations as appropriate to the Board.

- Review and approve the appointment or replacement of the Chief Ethics and Compliance Officer.

- Together with the Chief Executive Officer, develop and regularly assess the continuing appropriateness of a succession plan for the Company's Chief Executive Officer and, as applicable, the Company's other Executive Officers. Annually review the succession plan with the Board.

- Review risk-related disclosures in the Company's Securities and Exchange Commission filings.

- Maintain minutes or other records of meetings and activities of the Committee.

- Ensure Committee members receive ongoing education regarding risk management concepts, leading practices, and emerging risks.

- Review and reassess annually the Charter, structures, process and membership of the Committee.

**D.      Specific, Additional Duties Under OSI's Code Of Ethics And Conduct**

66.     The Company revised its Code of Ethics and Conduct ("Code") in May 2016.  The Code "contains [the] company's general guidelines and requirements for conducting business according to the highest ethical standards and best practices. This Code applies to employees, officers, and directors of OSI Systems, Inc. [ ] and our subsidiaries worldwide."

67.     The Code unambiguously states that "[o]beying the law is part of the foundation on which our ethical standards are built. You have an obligation to comply with every applicable local, regional, or national law or regulation in those jurisdictions in which we have a presence and operate our business. Violations of these laws can be extremely costly to us and can subject us (or you) to civil and criminal penalties."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

68.   As to financial reporting, the Code provides that, "[a]s a publicly traded company, we are obligated to comply with applicable securities laws, regulations, and reporting requirements.  Our corporate policy and these rules and regulations mandate that we report financial transactions accurately, completely, fairly, and in a timely and understandable manner.   We will not tolerate inaccurate, incomplete, delayed, or falsified reporting. Employees who are involved with financial reporting are required to understand and comply with applicable accounting standards and laws. If you have any questions or concerns about our financial reports or disclosures, Speak Up."

69.   With regard to government contracting compliance, the Code states that "OSI is committed to compliance with U.S. and international government contracting. Business dealings with government customers often include additional regulatory and legal requirements. Employees involved in federal contracting processes (solicitation, bids, proposals, contract and program management, operations, etc.) must: review and understand all applicable laws, regulations, and customer requirements associated with our bids, proposals, and contracts; provide timely, thorough, and accurate information in connection with our proposals, certifications, and representations; follow company protocol with regard to the review, approval, and signature of contract-related documents and processes; complete annual contracting compliance training, and; Speak Up and report any suspected misconduct or unethical conduct associated with a government contract or subcontract (including, but not limited to, overbilling the government, false information or claims, violation of law or statute, or other unethical behavior)."

70.   With respect to anti-corruption and anti-bribery, the Code states that "[w]e are firmly committed to complying with international anti-corruption and anti-bribery laws including the U.S. Foreign Corrupt Practices Act (FCPA) and the U.K.  Bribery Act. OSI's Anti-Corruption Compliance (ACC) Policy strictly prohibits making, offering, promising, or authorizing a corrupt payment of money, or anything of value, to a government official or any other person in order to obtain or retain business, or to

16

direct business, or to achieve any business-related objective. You are also prohibited from receiving a corrupt payment of money, or anything of value, in connection with your employment with our company. All employees are required to read and abide by our Anti-Corruption Compliance Policy, which places strict guidelines on extending gifts and entertainment, covering travel and accommodation expenses for third-parties, and interacting with OSI's business partners."

71.     This Code, revised in May 2016, replaced the previous version of the Code dated May 2014.

**E.     Specific, Additional Duties Under Regulatory And Shareholder Settlements**

72.     OSI's repeated scandals with the U.S. Government had serious implications for the Company.  On May 17, 2013, the Department of Homeland Security ("DHS") issued OSI with a Notice of Proposed Debarment and automatic suspension of Rapiscan that became effective on May 20, 2013.  In addition to losing government contracts valued in the hundreds of millions of dollars, a sustained debarment from the DHS would have prevented OSI from contracting with the U.S. Government in the future, jeopardizing hundreds of millions of dollars in Company revenue.

73.     To avoid debarment, on June 21, 2013, the Company announced that its subsidiaries, Rapiscan Systems, Inc. and Rapiscan Government Services, Inc., had entered into a 30-month Administrative Agreement with the DHS ("Administrative Agreement") whereby the Company "agreed to certain compliance upgrades and organizational improvements, including maintenance of a robust compliance program. Rapiscan has also made certain personnel changes and has created additional positions dedicated to government contracting compliance and administration, corporate compliance, and quality assurance. Further, for the duration of the term of the Agreement, Rapiscan has agreed to the continued review of its compliance and ethics program, including the retention by Rapiscan of an independent consultant to perform

1   semi-annual assessments of its compliance policies, procedures, and practices.

2   Rapiscan has also agreed to additional DHS reporting requirements."

3        74.   Moreover, in settling the prior derivative litigation, OSI undertook even

4   more stringent corporate governance requirements to ensure compliance with the law.

5   Under the Derivative Settlement (finally approved on May 2, 2017), a "Formal

6   Investigations Protocol was adopted to formalize responsibility for investigating ethics

7   and compliance violations."   In addition, OSI agreed to conduct "Corporate

8   Governance Reviews," under which OSI was "required to retain an ethics and

9   compliance specialist to conduct periodic reviews for one year after the expiration of

10  the Administrative Agreement, currently set to expire in December 2017."

11       75.   Moreover, the Derivative Settlement resulted in the appointment of a Lead

12  Independent Director who is to "advise the Chairman of the Board as to the quality,

13  quantity, and timeliness of the flow of information from the Company's management

14  that is necessary for the independent directors to perform their fiduciary duties, and

15  although the Company's management is responsible for the preparation of materials

16  for the Board, the Lead Independent Director may specifically request the inclusion of

17  certain material."   The settlement also resulted in the appointment of a New

18  Independent Director who "will have compliance related experience—defined as

19  successful experience in a highly-regulated industry (e.g., government contracting or

20  healthcare)." That New Independent Director is Defendant Chizever.

21       76.   As an added incentive to having an effective Compliance Program in

22  place, the Derivative Settlement directly tied compensation to compliance.   The

23  settlement provided that "OSI shall amend its Compensation Committee Charter to

24  include compliance as a factor in determining incentive compensation. OSI already has

25  implemented ethics and compliance as a component of performance reviews affecting

26  compensation. OSI shall amend this committee's charter to specify that in determining

27  incentive compensation for relevant senior executives, the Compensation Committee

28  will consider conduct in compliance with or in violation of the Company's Code of

1  Ethics."

2  **IV.   DEFENDANTS' BREACHES OF FIDUCIARY DUTY**

3       77.   At all relevant times, OSI had an information and reporting system that

4  was supposedly designed to monitor the Company's compliance with applicable laws

5  and regulations.  Ostensibly, this monitoring system was put in place pursuant to the

6  Code of Conduct, enhanced by the Administrative Agreement and further enhanced by

7  the terms of the Derivative Settlement.

8       78.   In order to discharge their fiduciary duties, Defendants, at a minimum,

9  should have taken a number of basic steps to monitor OSI's information and reporting

10  system.  Among other steps, Defendants should have familiarized themselves with the

11  circumstances surrounding the Albanian Contract.  At no time did any Defendant

12  inquire as to the circumstances of the procurement of the Albanian Contract.

13  Importantly, when certain "red flags" appeared, identified with particularity herein,

14  such as delays in the implementation of the Albanian Contract, the need to renegotiate

15  the Albanian Contract, and the need for arbitration concerning the Albanian Contract,

16  Defendants did not conduct any investigation, made no inquiries and did not follow up.

17       **A.   OSI's Audit Committee Failed To Monitor OSI's Information And**

18            **Reporting System And Failed To Take Adequate Steps To Ensure**

19            **That OSI's Albanian Contract Was Compliant With All Relevant**

20            **Laws**

21       79.   As reflected in the minutes of their meetings, the Audit Committee failed

22  to monitor OSI's information reporting system to assess the state of the Company's

23  compliance with the regulations concerning government contracts as those regulations

24  related to the Albanian Contract.  The minutes show that there were only *two*

25  discussions by the Audit Committee of the Albanian Contract over a period of five

26  years, one on October 21, 2013 and one on April 21, 2016, both of minor substance.

27       80.   None of the produced minutes indicate any discussion of the multiple red

28  flags raised by the Albanian Contract, including:   (i) the unexplained favorable

19

1   treatment from the Albanian government, such as receiving, on November 11, 2011,
2   an 8% bonus on OSI's bid; (ii) the transfer, authorized by Defendant Mehra, of 49% of
3   OSI's interest in S2 to the Albanian holding company ICMS, owned by an Albanian
4   dentist Peçini, for consideration of less than $5.00; (iii) the joint venture and profit-
5   sharing agreement with ICMS; (iv) the denouncement of the contract by the newly-
6   elected government upon Berisha's departure from office; (v) the recommendation by
7   the Albanian Competition Authority for the revision of the contract; and (vi) the new
8   Albanian government's refusal to implement the contract and attempt to unilaterally
9   terminate it.

10          81.    According to Company's Board minutes, on October 21, 2013, the Audit
11   Committee met. Jason Lawson, from Moss Adams LLP, OSI's auditors, discussed "the
12   Company's new turnkey security system in Albania." The minutes reflect no details
13   of the discussion and no follow up by the Audit Committee. Moreover, no books and
14   records produced by the Company show what, if any, information Lawson had
15   regarding the Albanian Contract, or what he shared with the Audit Committee, and
16   there is no suggestion that Lawson was even privy to the details surrounding the
17   awarding and implementation of the Albanian Contract.

18          82.    Between October 21, 2013 and April 21, 2016, the Audit Committee never
19   again discussed the Albanian Contract. For example, on October 28, 2015, the Audit
20   Committee met. The minutes reflect that the Company's VP of Internal Audit, Felipe
21   Velasquez ("Velasquez"), reported on "compliance with the Administrative
22   Agreement with DHS, and FCPA compliance. In response to questions from Messrs.
23   Luskin and Ballhaus, Messrs. Velasquez and Cook [VP, Corporate Compliance]
24   discussed the environment for ethics and compliance at the Company." The minutes
25   of that meeting further reflect that compliance programs were generally discussed and
26   that Mr. Cook discussed the upcoming report to DHS under the Administrative
27   Agreement. Committee members did not discuss the Albanian Contract at this Audit
28   Committee meeting.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

83.     On January 25, 2016, the Audit Committee met again.  The minutes reflect that Velasquez reported on "compliance with the Company's Anti-Corruption program, the Administrative Agreement with DHS, and the Enterprise Risk Management program."  However, again, the Audit Committee did not discuss the Albanian Contract at this meeting.

84.     It was not until the Audit Committee's meeting on April 21, 2016 that the Albanian Contract was once again mentioned.  According to the minutes, Alan Edrick (Executive Vice President and Chief Financial Officer) ("Edrick") responded to questions from Good and "discussed cash flows for the Company's turnkey scanning program in Albania and overall collections." However, books and records produced by the Company do not show what, if any, information Edrick shared with the Board regarding the Albanian Contract.

85.     On October 26, 2016, the Audit Committee met.  The minutes reflect that Velasquez reported on "the Company's compliance with the FCPA and the Administrative Agreement with DHS."  According to the minutes, Cook "reported on the activities of the Compliance Department" and also discussed the "independent assessment of the Company's Ethics and Compliance Program."  There is no reference to any discussion of the Albanian Contract at this Audit Committee meeting.

86.     On January 25, 2017, the Audit Committee met.  The minutes reflect that Velasquez reviewed "the Company's compliance with the DHS Administrative Agreement…and the FCPA."  The minutes also reflect that Cook "reported on interactions with the DHS relating to the Administrative Agreement."  There is no reference to any discussion of the Albanian Contract at this Audit Committee meeting.

87.     At the Audit Committee meeting on August 22, 2017, Velasquez "discussed compliance with the Administrative Agreement with DHS and the FCPA..." The minutes also reflect that Cook "reviewed the activities of the Ethics and Compliance function during fiscal 2017…[and] also reported on the status of the Administrative Agreement with the DHS."  There is no reference to any discussion of

1   the Albanian Contract at this Audit Committee meeting.

2        88.   On October 25, 2017, the Audit Committee met.  According to the

3   minutes, Cook "reported on compliance with the DHS Administrative Agreement,

4   stating that the compliance consultant had issued her last report to DHS…[and] stated

5   that the report was positive and reviewed its key findings."  There is no reference to

6   any discussion of the Albanian Contract at this Audit Committee meeting.

7        89.   In short, since 2013, there have only been two meetings at which the Audit

8   Committee referred to the Albanian Contract.  Remarkably, at those two meetings, the

9   Audit Committee did not even discuss any of the specifics related to the circumstances

10   of obtaining the Albanian Contract or the accounting for the Albanian Contract.

11        90.   What is even more remarkable about the Audit Committee's (and the

12   Board's) lack of attention to the Albanian Contract situation is the fact that, in their

13   interim review for the period ending December 31, 2015, OSI's auditor, Moss Adams

14   LLP, categorized "Albania contract update" as a topic under "*Items of Significance for*

15   *Quarterly Review.*" (emphasis added).  OSI has produced no minutes showing any

16   discussion regarding this entry by any member of the Audit Committee or by any

17   member of the Board.  An auditor notation as an item of "Significance for Quarterly

18   Review" evidences a red flag that should have garnered serious attention by the Audit

19   Committee and the other members of the Board.  However, neither the Audit

20   Committee nor the other members of the Board inquired about the Albanian Contract

21   at all.

22   **B.    The Board As A Whole Failed To Monitor OSI's Information And**

23   **Reporting System And Failed To Take Adequate Steps To Ensure**

24   **That OSI's Albanian Contract Was Compliant With All Relevant**

25   **Laws**

26        91.   Apart from the Audit Committee, the Board as a whole consciously

27   disregarded its duties to monitor the Company's reporting and information system.

28   Specifically, none of the Board minutes produced by the Company indicate any

22

1  discussion of the multiple red flags facing the Company which include:   (i) the
2  unexplained favorable treatment from Albania's government such as receiving, on
3  November 11, 2011, an 8% bonus on OSI's bid; (ii) the transfer, authorized by
4  Defendant Mehra, of 49% of OSI's interest in S2 Albania to the Albanian holding
5  company ICMS, owned by an Albanian dentist Peçini, for consideration of less than
6  $5.00; (iii) the joint venture and profit-sharing agreement with ICMS; (iv) the
7  denouncement of the contract by the newly-elected government upon Berisha's
8  departure from office; (v) the recommendation by the Albanian Competition Authority
9  for the revision of the contract; and (vi) the new Albanian government's refusal to
10  implement the contract and attempt to unilaterally terminate it.

11         92.    On October 21, 2013, the full Board met.  The meeting minutes reflect
12  that Defendants Chopra, Good, Luskin, Feinberg, and Ballhaus were in attendance.
13  Edrick discussed the Albania "turnkey security screening programs, including cash
14  flows, profits and return on investment."  However, books and records produced by the
15  Company do not show what, if any, information Edrick shared with the Board
16  regarding the Albanian Contract.

17         93.    The full Board met again on April 23, 2014.  The meeting minutes reflect
18  that with Defendants Chopra, Good, Luskin, Feinberg, and Ballhaus in attendance,
19  Chopra discussed the status of the Company's turnkey screening program in Albania.
20  However, no books and records produced by the Company show the particularity of
21  what was discussed with the Board or that the Board inquired about or learned of the
22  circumstances surrounding the awarding of the Albanian Contract.

23         94.    On August 22, 2014, the full Board met again.  The meeting minutes
24  reflect that with Defendants Chopra, Mehra, Good, Luskin, Feinberg, and Ballhaus in
25  attendance, Chopra discussed the status of the Company's turnkey screening program
26  in Albania.  However, no books and records produced by the Company show the
27  particularity of what was discussed with the Board or that the Board inquired about or
28  learned of the circumstances surrounding the awarding of the Albanian Contract.

95.     This was despite the fact that, among the materials presented to the Board in connection with the August 22, 2014 Board meeting, there was an update which referred specifically to the Albanian Contract and which stated prominently, on the bottom border of the document, "Challenging Situation."   In addition, under the heading "Other" there were three items - "Operating Start date delayed"; "Government Administration change"; "US Embassy very supportive."   Remarkably, neither the Board minutes nor the accompanying Board materials reveal that any member of the Board inquired, or was told any details, about the Albanian Contract, why it was a "Challenging Situation" and/or what the significance was of the change in government administration.   Being told that a significant Company contract has resulted in a "Challenging Situation" is a red flag that would warrant additional inquiry.  The Board Defendants failed to monitor.

96.     On October 21, 2014, the full Board met.  The meeting minutes reflect that with Defendants Chopra, Mehra, Good, Luskin, Feinberg, and Ballhaus in attendance, Mehra, who was personally involved in the misconduct concerning the Albanian Contract, "provided an update on the turnkey security services business...[and] discussed the status of the turnkey programs in Puerto Rico and Albania."  However, no books and records produced by the Company show what was discussed with the Board or that the Board inquired about or learned of the circumstances surrounding the awarding of the Albanian Contract.

97.     The full Board met again on December 12, 2014.  The meeting minutes reflect that with Defendants Chopra, Good, Luskin, Feinberg and Ballhaus in attendance, "Mr. Chopra responded to questions from the other directors regarding turnkey scanning programs in Mexico, Puerto Rico and Albania..."  However, the specific details of what was discussed with the Board (or what the Board inquired about or learned regarding the circumstances surrounding the awarding of the Albanian Contract) are not evident in any of the books and records produced by the Company.

98.     On April 22, 2015, the full Board held another meeting.  The meeting

24

minutes reflect that with Defendants Chopra, Mehra, Good, Luskin, Feinberg, and Ballhaus in attendance, Mehra reported on the status of the Company's turnkey security inspection program in Albania and on "the financial results for the turnkey services business." However, the specific details of what was discussed with the Board (or what the Board inquired or learned regarding the circumstances surrounding the awarding of the Albanian Contract) are not evident in any of the books and records produced by the Company.

99.    The materials presented to the Board in connection with the April 22, 2015 Board Meeting included, among other things, a status sheet with the following bullet points appearing under the heading "Albania": "Significant discussions ongoing to find a resolution" and "Arbitration Process continues."   Remarkably, neither the Board minutes nor the accompanying materials show that any member of the Board inquired about or was told any details about the Albanian Contract and/or any details of the arbitration.   Being told that a major Company contract has resulted in "Significant discussions ongoing to find a resolution" and an ongoing arbitration are red flags that would warrant additional inquiry.  These Board Defendants failed to monitor.

100.   On August 19, 2015, the full Board met.  The meeting minutes reflect that with Defendants Chopra, Mehra, Good, Luskin, Feinberg, and Ballhaus in attendance, Mehra reported on the status of the Company's turnkey security inspection program in Albania and on "the financial results for the turnkey services business."  However, no books and records produced by the Company show that the Board followed up as to the "Significant discussions" or arbitration that were reflected in the Board materials from the April 22, 2015 Board meeting.  The Board continued to ignore the red flags.

101.   The full Board met again on October 28, 2015.  The meeting minutes reflect that with Defendants Chopra, Mehra, Good, Luskin, Feinberg (by telephone) and Ballhaus in attendance, Edrick "provided financial results for security turnkey solutions."  Then, "[i]n response to a question from Mr. Luskin, Mr. Chopra discussed the Security Division's maintenance and repair service business."  "Mr. Chopra also

discussed the cargo inspection projects and business dynamics in that market." Further, "Mr. Mehra provided the Board with an update on the status of the turnkey screening program in Albania." The minutes do not refer to any discussion regarding: the terminated Albanian contract; OSI's arbitration of the Albanian Contract; the renegotiated Albanian Contract; or any follow up from the April 22, 2015 Board Meeting. The Board continued to ignore the red flags.

102. The full Board met again on December 8, 2015. The meeting minutes reflect that with Defendants Chopra, Mehra, Good, Luskin, Ballhaus, and Hawkins in attendance, Mehra "provided an update of the turnkey solutions business" and a discussion on the "status of turnkey screening programs" in Albania, Puerto Rico and Mexico. The minutes also reflect that "Mr. Mehra then answered the Board's questions about the turnkey solutions business, including a question from Mr. Hawkins about the financial models employed and a question from Mr. Luskin about opportunities in Japan." "Financial results for security turnkey solutions" was also discussed. The minutes do not refer to any discussion regarding: the terminated Albanian contract; OSI's arbitration of the Albanian Contract; the renegotiated Albanian Contract; or any follow up from the April 22, 2015 Board Meeting. The Board continued to ignore the red flags.

103. The full Board met again on January 25, 2016. The Board materials sent to the Board in connection with the January 2016 Board meeting reflect that "Albania becomes fully operational in Q3 FY16." In addition to some financial information and some site information, the materials state that Albania "is ramping up nicely" and that there are "no payment issues." There appears to be no discussion as to what accounted for the delay and no discussion of the change in contractual terms or the circumstances surrounding the procurement of the Albanian Contract.

104. The full Board met again on April 21, 2016. The Board materials sent to the Board in connection with the April 2016 Board meeting reflect that "Albania became fully operational in Q3." In addition to some financial information and some

1  site information, the materials state that Albania "is fully operational and contributing

2  nicely" and that there are "no payment issues."  There appears to be no discussion as

3  to what accounted for the delay and no discussion of the change in contractual terms

4  or the circumstances surrounding the procurement of the Albanian Contract.

5      105.   The full Board met again in August 2016 and October 2016.  For both

6  meetings, the materials given to the Board in connection with this meeting state in

7  identical language, the following information regarding the Albanian Contract: "Fully

8  operational and contributing nicely" and "no payment issues."

9      106.   The full Board met again in January 2017.  The Board materials sent to

10  the Board in connection with the January 2017 Board meeting reflect that "Albania

11  became fully operational in Q3 FY16."

12      107.   The full Board met again in April and August 2017. The Board materials

13  sent to the Board in connection with the April and August 2017 Board meetings reflect

14  that "Albania became fully operational in Q3 FY16," that Albania "was fully

15  operational and contributing nicely" and that there were "no payment issues."

16      108.   With regard to each of the Board meetings reflected above, there appears

17  to be no discussion as to the circumstances surrounding the procurement of the

18  Albanian Contract nor any of the other issues surrounding the delay, renegotiation, or

19  arbitration regarding the Albanian Contract.

20      109.   Notably, the FY 2017 Internal Audit Annual Report shows that in testing

21  controls overseas, Albania was not tested.

22  **C.    The Company's Material False Statements And Omissions With**

23      **Regard To The Albanian Contract**

24      110.   At all relevant times, OSI touted in its SEC filings that its turnkey model

25  was the Company's most promising new business segment and that it would provide

26  higher profit margins, greater revenue visibility and consistency, and substantial

27  growth opportunities in international markets.

28      111.   OSI's Board was charged with making sure that its filings with the SEC

1    were complete and truthful.

2        112.   OSI's representations, however, regarding the success and sustainability

3    of the turnkey model, including the Albanian Contract, were materially false and

4    misleading and omitted material facts.

5        113.   For example, OSI repeatedly failed to disclose that the Company's $150

6    to $250 million turnkey contract with the Albanian government was the result of a

7    corrupt arrangement whereby OSI transferred 49% of its Albanian Contract and that

8    lucrative "profit shar[ing]" rights had been transferred to an undisclosed Albanian shell

9    entity ostensibly owned by the Albanian dentist, Peçini, who reportedly had ties to the

10   outgoing Albanian government that issued the contract to OSI.

11       114.   On August 25, 2014, the Company made mention of the Albanian

12   government's decision to suspend the contract, however no indication was provided as

13   to the allegations of corruption or to the political turmoil that had surrounded the

14   awarding of the contract.  The Company stated:

15           Last year, we announced a 15-year contract that we received from the

16           government of Albania to provide turnkey cargo and vehicle screening services

17           at various sites throughout the country of Albania. Unfortunately, we recently

18           learned that the customer, the Albanian newly elected government, has halted

19           further progress on the contract and put into doubt the continuation of the

20           program. The program had been proceeding smoothly and ahead of schedule.

21           We intend to strongly enforce our contractual rights and hope to reach an

22           amicable outcome. I would also note here that no revenues from Albania are

23           included from this contract in the revenue guidance we are providing for fiscal

24           2015. You can understand that, under the circumstances, we cannot comment

25           further at this time.

26       115.   Additionally, OSI's Form 10-K for fiscal year 2017 further stated that "in

27   August 2013, we announced a 15-year contract award from the Government of Albania

28   to provide turnkey cargo and vehicle screening services at various sites throughout the

country. We were recently notified that the Government of Albania has halted further progress on the contract. We have begun proceedings to protect our legal rights." Again, no indication was provided as to the allegations of corruption or to the political turmoil that had surrounded the awarding of the contract.

116.   Moreover, OSI still maintained on its books and records throughout that S2 Albania was a fully owned subsidiary of the Company.

117.   It was not until the publication of the Muddy Waters reports that investors were aware of the events surrounding the Albanian Contract.

## V.   OSI HAS SUFFERED SIGNIFICANT DAMAGE AS A RESULT OF DEFENDANTS' BREACHES

118.   As a result of Defendants' breaches, OSI shareholders have suffered significant harm.  As a result of the events surrounding the Albanian Contract, the Company is the subject of an investigation by the Enforcement Division of the SEC and by the U. S. Department of Justice.  In addition, the Company is a defendant in ongoing litigation pending in federal court.

119.   The Company is facing the possibility of paying fines in connection with the governmental investigation and damages in connection with the ongoing civil litigation.

120.   Moreover, as a serial recidivist, it is clear that the Company, despite having entered into the Administrative Agreement calling for enhanced corporate governance protocols and the prior Derivative Settlement calling for yet even further enhanced corporate governance protocols, the Company may face debarment proceedings as a government contractor and may have to undertake a more radical transformation at the Board level than experienced so far.

## VI.   TWO DEFENDANTS WERE RICHLY REWARDED DESPITE THEIR INVOLVEMENT IN THE MISCONDUCT IN CONNECTION WITH THE ALBANIAN CONTRACT

121.   Soon after the Muddy Waters report was published on December 6, 2017,

the Board apparently acted to financially reward Chopra.  The Board had no questions during the years of turmoil regarding the Albanian Contract, but within days of the reporting of serious allegations of broad misconduct, which has resulted in two governmental investigations, the Board acted swiftly to increase Chopra's compensation.  As reported in the Company's Form 10-Q for the first quarter of 2018: "On December 31, 2017, we and Deepak Chopra, our Chief Executive Officer, entered into an amendment to Mr. Chopra's employment agreement that, among other things, provides for a $13.5 million bonus payment to Mr. Chopra on or within 45 days of January 1, 2024 contingent upon Mr. Chopra's continued employment with us through that date, subject to accelerated payout terms in the event of Mr. Chopra's death or disability after January 1, 2019. The bonus is recorded in the financial statements over the remaining term of the employment agreement."

122.  This financial award is directly contrary to the Charter of the Compensation and Benefits Committee, which states: "In determining incentive compensation for relevant senior executives, the Committee will consider conduct in compliance with or in violation of the Company's Code of Ethics and Conduct.  It is also contrary to the terms of the settlement of the previous derivative action.

123.  The 2017 financial award was not the only curious compensatory award by the Board.  In 2015, OSI's Compensation Committee established a separate incentive program tied to the annual performance of the Company's turnkey solutions business.

124.  In 2016, 23,800 RSUs owned by Mehra vested a result of his achieving a bookings target of $225 million.  In 2017, Mehra received $705,000 for exceeding the operating income target of $10 million in the turnkey segment.

125.  Moreover, in 2017, although the Company had "determined not to adjust any base salary levels" for any of its executive officers, Mehra's "salary was increased by approximately 14% to $400,000 to compensate him for taking on significantly greater responsibility for the oversight and management of the cargo and vehicle

1  inspection and turnkey business lines within our Security division."

2  **DERIVATIVE ALLEGATIONS**

3  126.   Plaintiff brings this action derivatively in the right of and for the benefit

4  of OSI to redress injuries suffered, and to be suffered, by OSI as a direct result of the

5  violations of state law, including breaches of fiduciary duty by Defendants.

6  127.   OSI is named as a nominal defendant in this case solely in a derivative

7  capacity.  Plaintiff was a shareholder of OSI at the time of the transgressions of which

8  he complains, and continues to be so.  Plaintiff will adequately and fairly represent the

9  interests of OSI and its shareholders in prosecuting and enforcing their rights.

10  Prosecution of this action, independent of the current Board of Directors, is in the best

11  interests of the Company.

12  128.   The wrongful acts complained of herein subject, and will continue to

13  subject, OSI to continuing harm because the adverse consequences of the actions are

14  still in effect and ongoing.

15  129.   The wrongful acts complained of herein were unlawfully concealed from

16  OSI shareholders.

17  **DEMAND FUTILITY**

18  130.   Demand upon the OSI Board that they institute this action in the

19  Company's name would be entirely futile and is therefore excused.

20  131.   OSI's current Board consists of the following seven individuals:

21  Defendants Chopra, Mehra, Good, Luskin, Ballhaus, Hawkins, and Chizever.

22  132.   Defendants Chopra and Mehra are incapable of considering a pre-suit

23  demand. Chopra and Mehra stand accused of securities fraud and face a substantial

24  likelihood of liability.  The Company readily admits that Defendants Chopra and Mehra

25  are not independent.  Chopra and Mehra are also cousins.

26  133.   Defendants Good, Luskin, Ballhaus, and Hawkins are all incapable of

27  considering a pre-suit demand because they are, and have been, members of the Audit

28  Committee.  As such, each of these directors face a substantial likelihood of personal

liability for breaching their fiduciary duty.  Each of these Director Defendants failed to abide by the Audit Committee's Charter in that they, among other things, failed to oversee management regarding major financial risks and failed to ensure that the Company maintained effective internal controls over financial reporting.

134.  Defendants Good, Luskin and Ballhaus are, additionally, members of the Risk Management Committee.  The Risk Management Committee Charter mandates that the Committee members oversee management as to key enterprise risks, including strategic, operational, legal, regulatory and compliance.  Each of these Director Defendants therefore had even more heightened duties and are incapable of considering a pre-suit demand because they face a substantial likelihood of personal liability for breaching their fiduciary duty.

135.  Each member of the current Board cannot impartially consider a pre-suit demand to bring a Claim for Relief against the Director Defendants because each member of the current Board faces a substantial likelihood of personal liability as a Director Defendant for breaching his fiduciary duty under *Caremark*.

136.  As demonstrated by the minutes of the various Board meetings and the Board presentation materials, the Director Defendants did not take any steps to make sure they were adequately informed of the Company's affairs in Albania. As members of the Board, the Director Defendants had specific duties to monitor for the Company's compliance with the FCPA, but consciously disregarded those responsibilities.  The Director Defendants therefore face a substantial likelihood of liability for breach of their fiduciary duty under *Caremark*, and are interested for purposes of any demand.

137.  In addition, all of the current members of the Board are incapable of considering a pre-suit demand because each of them faces a substantial likelihood of personal liability for failing to abide by the terms of the previous Derivative Settlement and each of them apparently agreed to provide for substantial compensation to Chopra just days after allegations were published about widespread fraud involving the Company's activities in Albania.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

138.   Finally, each of the members of the Board other than Chizever are incapable of considering a pre-suit demand because each of them faces substantial personal liability as recidivist violators who have previously failed to properly oversee the Company as it was losing substantial government contracts due to, among other things, its inability to comply with basic government procurement rules and regulations.

## COUNT I

## BREACH OF FIDUCIARY DUTY

139.   Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

140.   By reason of their fiduciary relationship with OSI, each of the Director Defendants owed, and owes, OSI the highest obligation of loyalty, good faith, due care, oversight, fair dealing, and candor.

141.   In derogation of these duties, the Director Defendants have harmed the Company by their failure to properly monitor, properly supervise, ensure themselves of adequate internal controls, account for and disclose the events concerning the Albanian Contract.

142.   As a result of their breaches, OSI has suffered and will suffer significant financial and reputational harm.   Thus, the Director Defendants are liable to the Company.

143.   Plaintiff, on OSI's behalf, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

- Against all of the Director Defendants and in favor of OSI for the amount of damages sustained by the Company as a result of the Director Defendants' breaches of fiduciary duties;

- Directing OSI to take all necessary actions to reform and improve its corporate governance and internal procedures to protect the Company and its

33

shareholders from a repeat of the damaging events described herein, including, but not limited to, the termination of certain directors and the placing of a supervisory monitor within OSI;

- Declaring that Defendant Chopra forfeit his bonus of $13.5 million and that Defendant Mehra return his bonus of $705,000;

- Awarding to Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

- Declaring that Plaintiff may maintain this derivative action on behalf of OSI and that Plaintiff is a proper and adequate representative of the Company; and

- Such other relief as this Court deems just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

DATED:  March 8, 2019

Respectfully submitted,

**LTL ATTORNEYS LLP**
David W. Ammons
David A. Crane

Peter Safirstein
Elizabeth Metcalf
**SAFIRSTEIN METCALF LLP**
350 Fifth Ave., 59th Floor
New York, NY 10118
Telephone: (212) 201-2855
psafirstein@safirsteinmetcalf.com
emetcalf@safirsteinmetcalf.com

Hung G. Ta
JooYun Kim
Natalia D. Williams
**HUNG G. TA, ESQ. PLLC**
250 Park Avenue, 7th Floor
New York, NY 10177
Telephone: (646) 453-7288
hta@hgtlaw.com

Attorneys for Plaintiff
Jeffery Kocen

35

1

*Jeffery Kocen v. Deepak Chopra, et al.*

2

3      I am a party to this action, and I have read the foregoing Complaint and know its contents.

4    The matters stated in the Complaint are true based on my own knowledge, except as to those

5    matters stated on information and belief, and as to those matters I believe them to be true.

6      I declare under penalty of perjury under the laws of the State of California that the

7    foregoing is true and correct.

8

       Executed on March 8, 2019, at Overland Park, Kansas.

9

10

11                                                    _____
                                                              Jeffery Kocen
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28